**MATY v. GRASSELLI CHEMICAL CO.** *

No. 6224.

Circuit Court of Appeals, Third Circuit.

Sept. 2, 1938.

*Rehearing denied Oct. 20, 1938.

878

Thomas F. Gain, of Philadelphia, Pa., Mario Turtur, of Elizabeth, N. J., and Francis Shunk Brown, of Philadelphia, Pa., for appellant.

Louis Rudner, of Trenton, N. J., for appellee.

Before BUFFINGTON, DAVIS, and BIGGS, Circuit Judges.

DAVIS, Circuit Judge.

George Maty, the original plaintiff in this case, worked for the defendant from October, 1928 until November, 1933. For almost the entire first four years, he worked in the silicate department of the defendant's plant and for most of the last year in the phosphate department. In the latter part of 1931, he developed a cough accompanied by other distressing symptoms which grew progressively worse. In November, 1933 his condition was diagnosed as an abscess on his lung.

Maty brought suit to recover damages for his injury on the ground that his condition was caused by the inhalation of soda ash dust and other harmful substances while working for the defendant and that the defendant was negligent in failing to warn him of the dangers of this dust, in failing to provide proper ventilating facilities or to take any other measures for his safety and protection.

The case was tried to the judge and jury and on June 19, 1936 the jury returned a verdict for Maty.

On June 23, 1936 the District Court entered judgment on the verdict, but on motion by the defendant for a new trial or judgment non obstante verdicto, the court, on July 14, 1936, set aside the original verdict, vacated the judgment for Maty, and, apparently, in the absence of the jury, directed the entry of a verdict of "no cause of action" and entered judgment for the defendant thereon. The reason given by the learned trial judge for this action was "that there is not sufficient knowledge attributable to this company" of the dangers of soda ash and the other dusts. From the judgment so entered, Maty appealed, but pending the appeal, he died. His widow, Susie Maty, as administratrix of his estate, has been substituted as plaintiff in his place.

The only question here involved is whether or not the evidence was sufficient to sustain the original verdict for the plaintiff. In determining this question, the evidence must be considered in the light most favorable to the plaintiff with all legitimate inferences drawn in her favor. 5 C.J.Secundum, Appeal and Error §§ 1671, 1672, pp. 788 to 792; Cervona v. Delaware, L. & W. R. Co., 95 N.J.L. 246, 114 A. 14; Bencke v. Weltersbach, 108 N.J.L. 430, 158 A. 752; Wilkinson v. Walsh, 115 N.J.L. 243, 178 A. 721.

With the exception of the question of the applicability of the Workmen's Compensation Act, R.S.N.J.1937, 34:15-1 et seq., which was not raised by either party, the issues here presented are practically identical with those raised in the case of Boal v. Electric Storage Battery Co., 3 Cir., 98 F.2d 815, decided by this court. Since the injury here involved arose in New Jersey, the law of that state is controlling. Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. ——, 114 A.L.R. 1487, decided April 25, 1938.

Maty worked approximately four years in the furnace room of the silicate department where silicate glass was manufactured. In the process of manufacture, soda ash and sand were mixed in the room adjoining the furnace room with which it was connected by doors in a wall of corrugated sheet iron. This mixture was then conveyed to hoppers from which it was allowed to flow gradually into the furnaces, which were kept at approximately 2200 degrees fahrenheit. In the furnaces, this mixture liquified and was then discharged into settlers to clarify. After ten days it was stored in tanks according to quality.

Maty controlled the speed of the flow of the mixture from the hoppers into the furnaces, and also tended the fires.

The air in the furnace room was almost always filled with dust of soda ash and sand. The testimony of Maty shows that the chutes above the furnaces had holes in them; that when the mixture stopped flowing down these chutes, he had to hit them to start it flowing again; that when he did this, the mixture fell "like water" in great quantities through these holes, causing huge

clouds of dust; that additional dust also came into the furnace room through the doors connecting it with the mixing room, which were usually kept open; that after the defendant begain manufacturing met-asillicate in 1931 in an adjoining room, additional dust found its way into the furnace room from that source; that, as a result, the air in the furnace room was always laden with soda ash and other dust; and that the temperature in the furnace room was quite high, which caused him to perspire freely both in summer and winter.

During 1931, Maty developed a severe skin irritation, and also a carbuncle, which required an operation in the hospital. This caused him to lose about 12 weeks of work, during the first five of which he was confined to the hospital. Upon returning to work, he was given outside employment for about three weeks. During this time his skin irritation appeared to clear up. He then went back to work in the furnace room, where conditions remained unchanged, and his skin irritation reappeared. At one time it was so bad that there was no skin at all under his arms where he was raw, swollen and discharging a "yellow water".

About that time, he developed a cough accompanied by fever, cold sweats, shortness of breath, lack of sleep, lack of appetite and loss of weight.

In the winter of 1932 he was transferred to the phosphate department in the defendant's plant where he was put to work as a "silico fluoride operator." Maty testified that soda ash was mixed in a large tank with some liquid to make "soda ash liquor"; that the soda ash was introduced into the tank from chutes and hoppers which had holes in them through which soda ash dust would fall; that barium rock and also phosphate rock was ground to a powder in that department and that dust arose from this process also. As a result of these operations it appears that the dust conditions in the phosphate department were just about the same as they were in the silicate department.

During all of this time his cough and other symptoms grew progressively worse until in November, 1933, his condition was diagnosed as an abscess on his lung. In that month he stopped working and at the time of the trial he was confined to his bed.

There is no doubt about the seriousness of the disease which Maty contracted after working for several years in defendant's plant.

The testimony of various expert witnesses indicates that these dust conditions were the proximate cause of Maty's illness.

Dr. John E. Runnells, superintendent and medical director of the Union County Tuberculosis Sanitarium, in answer to a hypothetical question setting forth the conditions of Maty's employment and the caustic nature of soda ash, said that these conditions would cause him to have "a long continued chronic inflammatory condition of his bronchial mucous membrane and his lungs". Dr. J. Edward Gluckman, president of the Consultant and Advisory Staff of Essex County Sanitarium, consulting physician on the Board of Education on Tuberculosis, visiting physician to the Deborah Sanitarium, and consulting physician for the Beth Israel Hospital on tuberculosis, said: "I believe that this condition is due to the inhalation of some irritant which caused a bronchial condition in his lung and the breaking down of this bronchial condition caused the abscess." Dr. Alexander O. Gettler, professor of chemistry at New York University, professor of Toxicology at Bellevue Medical College and Toxicologist for the chief Medical Examiners' office of New York City, in explaining the manner in which soda ash dust irritates and decomposes the tissues of the human body, testified that soda ash is sodium carbonate; that when it comes into contact with water, it ionizes into carbon, sodium and hydroxyl ions; that these hydroxyl ions are very irritating to the tissue, being the irritating agent in caustic soda; that its effect is to decompose tissue, first by attacking the protein, then by saponifying the fats and lipoids, and that finally by drawing the water out of the skin, it causes dehydration; and that all of this results in corrosion, irritation and finally ulceration. He said that "the literature states throughout * * * the caustic effect of these substances on tissues." Dr. William H. McCallion, visiting surgeon of the Alexon Brothers Hospital; chief of the surgical clinic of Elizabeth General Hospital, all in Elizabeth, testified that he attended Maty; that "dust is recorded as one of the chief causes which gives rise to cough, and from cough the breaking down of these dilated bronchioles,

and the eventuation into this lung condition" (bronchiectasis); that "coughing is a tremendous effort on the part of the lung, and that in turn, the persistency of the cough and the lack of sleep, the general loss of resistance, may permit this man or woman becoming infected easier"; that bad infection from bronchiectasis "can eventuate into a lung abscess", and that "a condition that could cause a bronchiectasis * * * can also cause an abscess of the lung". The evidence also indicates that soda ash is a soluble dust and would, for that reason, have a greater irritating effect upon the tissues.

The defendant denies that it was negligent, but the evidence in our opinion is sufficient to sustain the verdict of the jury. It did not provide any ventilating facilities, but depended solely upon the force of gravity and open windows to clear the air which expert testimony indicates was inadequate. Neither did it provide Maty nor the other employees with respirators, as do some other industries where soda ash is used. It cannot, therefore, be held as a matter of law that the defendant complied with the safety standards prevalent in the industry at that time. Accordingly the case of Grammer v. Mid-Continent Petroleum Corp., 10 Cir., 71 F.2d 38 cited by defendant is inapplicable.

The ground upon which the learned trial judge based his action was that there was "not sufficient knowledge attributable to this company".

While the evidence as to the availability of information concerning the danger of soda ash and the other dusts may be conflicting, yet there is sufficient evidence of its availability to support the original verdict for the plaintiff.

The evidence shows that the defendant could easily have ascertained the presence of this harmful dust in its plant and the danger to those working in it. The plant physician knew that Maty and others had contracted skin diseases from working in this atmosphere. The evidence also shows that he knew or should have known that working in this atmosphere might lead to a lung abscess.

But if it be true that the defendant did not know of the presence and danger of the dust in its plant, it is charged in law with that knowledge and is liable for the damage caused to its employees. 39 C.J. 491; Smith v. Oxford Iron Co., 42 N.J.L. 467, 36 Am.Rep. 535; Zellers v. Delany, 80 N.J.L. 452, 78 A. 212. It is immaterial under the facts in this case that it did not foresee the particular injury here involved. 39 C.J. ·290.

The final question is whether or not this court has power to order the District Court to reinstate the original verdict and judgment for plaintiff.

We would have had that power, had the District Court received the original verdict conditionally on points of law reserved. Baltimore & Carolina Line v. Redman, 295 U.S. 654, 55 S.Ct. 890, 79 L.Ed. 1636; Freudenheim v. Eppley, 3 Cir., 88 F.2d 280. The procedure followed was substantially the same as if it had done so. Therefore, the judgment for defendant must be reversed and the case remanded to the District Court with directions to reinstate the original verdict and judgment for the plaintiff.